DETERMINED IN

# THE SUPREME COURT

OF THE

# STATE OF WYOMING.

OCTOBER TERM, 1898.

IN RE APPORTIONMENT OF INDEBTEDNESS BETWEEN FREMONT AND BIG HORN COUN-TIES.

SAME BETWEEN JOHNSON AND BIG HORN COUNTIES.

SAME BETWEEN SHERIDAN AND BIG HORN COUNTIES.

COUNTIES AND COUNTY DIVISION — APPORTIONMENT OF INDEBTED-NESS BETWEEN OLD AND NEW COUNTIES — CONSTITUTIONAL LAW — STATUTES AND STATUTORY CONSTRUCTION — LIMITATION UPON COUNTY INDEBTEDNESS — TAXATION — JURISDICTION — DEBTS TO BE INCLUDED IN APPORTIONMENT — DELINQUENT TAXES AS DEBTS AND ASSETS — JUDGMENTS, COLLATERAL· ATTACK — AUTHORITY OF COLLECTOR OF OLD COUNTY TO COLLECT TAXES FROM PROPERTY IN NEW COUNTY.

1. If a part of the territory and inhabitants of a county are separated from it by annexation to another, or by the creation of a new county, the remaining part of the county retains its property and rights, and remains subject to all its obligations and duties, and responsible for the entire indebtedness of the original county existing at the time of the division, in the absence of a contrary constitutional or statutory provision on the subject.

2.   Subject only to constitutional declarations, the rule for the apportionment of debts and property between an old county and a new one composed, partly or wholly, of territory taken from the old, belongs exclusively to the Legislature; and it has power in such case to divide the common property and burdens in such a manner as may seem to it just, reasonable, and equitable, and to compel taxation for that purpose.

3.   The provision for apportionment may be made by general law passed previously to the act dividing the county, or such apportionment may be provided for after the enactment of the statute dividing the county, either by a general law; or by a special act, if special legislation is not, in such case, prohibited.

4.   At the time of the enactment of the territorial statute, relating to the apportionment of indebtedness upon the organization of new counties — Sections 678-683, Rev. Stat. of 1887 — (Secs. 1013-1018, Revision of 1899), the same was within the power of the Legislature: and it is continued in force by virtue of the constitutional provision (Art. 21, Sec. 3) continuing in force all laws of the territory not repugnant to the constitution.

5.   Said statute concerning the apportionment of indebtedness between an old and a new county is not repugnant to the constitution.

6.   Neither is said statute invalid as imposing upon the new county an indebtedness in excess of the constitutional limitation upon county indebtedness.  The proportion of the indebtedness of the old county required by the statute to be assumed and borne by the new county, is not such a debt as is affected by the constitutional limitation upon county indebtedness.

7.   The effect of the constitutional provision, requiring a new county created out of territory taken from an old county, to assume and be holden for an equitable proportion of the indebtedness of the old county so reduced, is the exclusion of the debt to be so assumed from the restrictive provisions of the constitution limiting county indebtedness.

8.   The proportionate indebtedness of the original county, to be assumed by a new county, is not a new burden.  No new debt is created.  There is merely a division of a debt already existing.

9.   The liability of the new county for its proper proportion of the indebtedness of the original county, and the warrants of

the new county which may be issued in satisfaction thereof, will constitute part of the public debt of the new county, for the payment of which taxes may be levied in addition to the tax authorized for current county revenue. The debt thus assumed will not operate as a charge only upon the funds raised by the limited tax for county revenue.

10. The statute of 1893, chapter 33 (Revision of 1899, sections 1216 and 1217), with reference to the presentation of claims against a county and their allowance, and restricting the issuance of warrants in certain cases, has no reference or application to the adjustment of debts and property between an old and new county. The claim of the old county for contribution is not one for presentation to, or allowance by the board of the new county.

11. The order of the district court in adjusting the indebtedness between the old and new county, ought not, in terms, require the new county to issue warrants against any particular taxes, or against those for any particular year; but the warrants should be ordered to be made payable at the time or times as required by the statute, since the statute is in itself sufficient as to taxes requiring the new county in each year, when any of the warrants become due, to levy a sufficient tax to pay the same.

12. The report of the board of commissioners of the parent county respecting the indebtedness of such county, which is required by the statute to be made to the court as a basis for the proceedings in the adjustment of the same between such county and the new one, is not conclusive upon the court as to the amount of the actual indebtedness.

13. The court, however, is precluded from inquiring and determining in such proceeding whether the debts so certified and reported by the parent county, and which are shown to have been allowed by the constituted authorities of such county, were incurred in violation of constitutional or statutory limitation upon the aggregate amount of county indebtedness, they not having been adjudged illegal by a competent tribunal; in the statutory proceeding for the apportionment of the indebtedness of an old county, between it and a new one created out of its territory, the court is without jurisdiction to enter upon an investigation as to whether in the incurring and allowance of the debts by the old county the constitutional or statutory restrictions upon the aggregate amount of county indebtedness had been violated.

14. Whatever debts are binding upon the old county are proportionately binding upon the new.

15. Strictly speaking, the new county, prior to apportionment, is not a debtor of the old, nor a debtor to the respective holders of the obligations of the parent county. It is a representative of certain territory, and the inhabitants thereof, formerly liable for all the debts binding upon the old county, and is bound under constitutional and statutory provisions to assume in its new capacity the burden theretofore resting upon that territory recently brought within its jurisdiction.

16. The obligations of the parent county being such as may ordinarily be contracted, limited only by its financial condition, such obligations duly and regularly allowed are *prima facie* valid and legal, and must be so considered and dealt with collaterally, until they are discredited by a competent tribunal.

17. As to all pre-existing debts of the original county, the board thereof is the agent and representative not only of the taxpayers and citizens remaining within its reduced boundaries, but as well of those within the territory recently belonging to it, but now separated from it. The board represented the entire county as it existed when the debts were incurred.

18. Although the board can not lawfully allow any claim not authorized by law; if it does so, and afterward pays the claim, in the absence of any steps having been taken to vacate the order of allowance or to procure the cancellation of the order issued thereon, the individual taxpayer is remediless.

19. The proceedings for apportionment of indebtedness between an old and a new county do not embrace, nor sustain any relation to, either of the remedies afforded a taxpayer to have avoided the unlawful creation of a debt by the county authorities.

20. In the audit and allowance of claims, the county board necessarily determines that they are debts not only such as may usually be incurred, but that they are also not prohibited by constitution or statute; and unless they have been adjudged illegal by a competent tribunal, the power of the court, in apportionment proceedings does not embrace the right to determine whether such allowed debts were created in violation of limitations upon the amount of county indebtedness. In such proceedings, claims which have been regularly allowed by the board of the parent county, are to be

considered, whether they are represented by warrant, orders, or certificate of indebtedness, or not.

21.   A judgment against a county rendered by a court of competent jurisdiction, is conclusive as against a collateral attack by the county itself or a citizen or taxpayer thereof. Such judgment is equally binding upon the new county; and in proceedings for apportionment of the old county's indebtedness, can not be questioned by the new county.

22.   Since an indebtedness of a county to the State for the amount of the State tax levy does not depend upon any act of the county authorities, either in respect to its creation, audit, or allowance, but is purely of statutory origin; if such a debt is incapable of creation under any circumstances whatever, because of some constitutional prohibition, it should not be considered in the apportionment; but if the liability is one which ordinarily is authorized and legal, and capable of being defeated only by some matter of fact to be interposed by way of defense, then the court would be precluded from inquiring into the validity of such a debt, in proceedings for apportionment. (The question, whether any right exists in the Legislature to fasten a debt upon a county for the amount of the State levy remaining uncollected is not presented or decided.)

23.   Unpaid taxes due to the parent county from citizens and residents of the new county, are not entitled to be considered as *debts* of the parent county, and to be proportionately assumed by the new county; even if such taxes are lost to the old county, but if valid and collectible they are to be treated as *assets* of the old county.

24.   Generally, uncollected taxes due the parent county, which when paid to the county will constitute a part of its revenue, are *assets* or *credits* of the old county, and should be so considered in making the apportionment.

25.   Taxes levied by the old county for common school purposes, or special levies for school districts, which, when collected, are payable only to the various districts, are not to be regarded in the apportionment, since the proceeds of such taxes do not swell the county revenue, and are not employed in the conduct of the ordinary county affairs.

26.   Taxes levied for State purposes should operate as assets of the parent county, provided the debt of such county for deficiency due the State is accounted as an indebtedness; otherwise not.

27. In crediting the new county, or charging the old, with delinquent taxes due the latter, their value only should be considered, and not necessarily the aggregate amount shown upon the rolls; such as are shown to have become absolutely uncollectible should not be treated as assets. *Prima facie*, however, the taxes shown upon the rolls are valid and collectible, and should be so treated in the absence of a showing to the contrary.

28. All matters of property, debts, credits, assets, and liabilities of the parent county should be adjusted, in proceedings for apportionment between the old and new county, upon principles of justice and equity, rather than by any technical rules of strict law.

29. The old county is entitled to the taxes due upon its rolls assessed prior to its division; and this applies to the taxes previously assessed, but collected in part from the segregated territory.

30. Upon the division of a county by the organization of a new county, the taxes previously levied by the former remain obligations due to it.

31. No official of the new county can legally collect the taxes due the parent county from the property or persons located in the new county solely by virtue of its creation and organization.

32. Although as a general rule, county officers have no authority to act outside of their county, and a tax collector can not proceed for the collection of taxes against lands or personalty lying beyond his territorial jurisdiction; a contrary rule prevails where the property already subject to a tax lien has been transferred to another county by a division of the county.

33. A tax lien is not defeated by a contraction of the county boundaries; and upon the division of a county, the tax collector of the old county possesses the same authority as before the division, to collect the taxes already due his county from the property assessed, and which has become located in the new county, by reason of the division, and upon which a lien for any of the taxes had attached. (Whether he has power to distrain property beyond the limits of his county not previously subject to a tax lien is doubted.)

34. The statutes should receive that interpretation, if possible, which will not operate to deprive a county, which has been divided, of its tax revenue once lawfully provided for, nor

. to relieve the taxpayer whose property falls within the new county of the tax legally levied against him and his property.

[Decided November 14, 1898.]

- Reserved Questions from the District Court, Sheridan County, Hon. Joseph L. Stotts, *Judge.*

Proceedings for the apportionment of the indebtedness of the original counties of Fremont, Johnson, and Sheridan, between them respectively and the county of Big Horn, created out of territory taken partly from each of said original counties. The opinion contains a full statement of the facts.

*Melville C. Brown* and *J. S. Vidal,* for Fremont County.

The power to divide counties and apportion indebtedness is lodged solely in the Legislature. Its action in the premises is final and conclusive. Having appointed a tribunal to make the apportionment, and fixed a rule by which it is to be made, it can not be successfully contended that something is to be done not provided for, or that some discretion is lodged in a tribunal where none is indicated by the legislative enactment. (Sutherland on Stat. Const., Sec. 473; Dillon on Mun. Corp., Secs. 10, 34, 35, 127–129; Board v. Board, 92 U. S., 307; id., 1 Wyo., 137.) The right emanating from the statute, and a specific remedy provided, the right can be vindicated in no other way. (Suth. Stat. Const., Secs. 399, 454, 459; Sudley v. Mayhew, 3 N. Y., 9; Dickinson v. Van Wormer, 39 Mich., 141; Wells on Jurisdiction, p. 55; Morse v. Presley, 5 Foster, 299.) When courts of general jurisdiction are exercising special statutory authority, their proceedings stand upon the same footing as courts of limited and inferior jurisdiction. (Deming v. Corwin, 11 Wend., 647; Jackson v. Estey, 7 id., 148; Sharp v. Spier, 4 Hill, 11; Striker v. Kelly, 7 id., 76; Buck v. Dowley, 16 Gray, 558; Salon v. State, 5 Tex. App., 301.)

The statute is not repugnant to the constitution. The constitutional limitations upon the creation of county indebtedness affects the imposition of a proportionate liability upon the new county, for the debts of the old county. In fact, such liability is imposed by the constitution itself. The constitution should be so construed as to harmonize and give force to all its provisions. Cooley Const. Lim., 58, and cases cited.)

The court has no authority to inquire into the validity of the debts of the old county, as reported by its board of commissioners. (Blaine v. Smith (Idaho), 48 Pac., 286; Orange Co. v. Los Angeles County (Cal.), 46 Pac., 173; Com'rs v. Barker, 16 Kan., 498; Tulare v. Kings Co., 49 Pac., 8; Mills Co. v. Brown Co., 29 S. W., 650; Lawrence Co. v. Meade Co., 62 N. W., 131; Brown Co. v. Rock Co., 70 N. W., 943; Halliday Co. v. Sweet Grass Co., 48 Pac., 553; Colusa v. Glenn Co., 49 Pac., 457.

*T. P. Hill, Charles H. Burritt,* and *Alvin Bennett,* for Johnson County.

The district court can not inquire into the legality of the debt of Johnson County. 1. Because this is not an ordinary action at law, in which Big Horn County can appear and litigate the validity of the debts. It is a special proceeding under the statute, and if the court should venture to pass upon that question, the very object of the law would be defeated. Blaine Co. v. Smith, 48 Pac., 286. 2. Big Horn County is estopped from claiming that the debt is illegal, which it assumed upon its organization. Tone v. Columbus, 39 O. St., 281; Stewart v. Hovey, 26 Pac., 683. (Other points were urged and authorities cited, covered in the abstract of the brief of counsel for Fremont County.)

*C. F. Rathbone, E. E. Lonabaugh,* and *W. S. Metz,* for Big Horn County.

The territorial statutes providing the method and proceedings for apportioning indebtedness between an old

and new county, is unconstitutional, and was repealed by Art. 12 of the constitution, which requires a new county to bear a just proportion of the indebtedness of the parent county. Big Horn County was organized after the constitution took effect. The constitutional provision is not self-executing. No act of the *State* Legislature having been passed upon the subject, no means are provided, by law, for enforcing the said provision.

The former statute is unconstitutional for the reason also that it permits a debt to be imposed upon the new county in excess of constitutional limitations upon the creation of county indebtedness. In the absence of valid statutory provision to the contrary, an old county, out of which a new one is formed, will be entitled to all public property and liable for all its debts. (32 Pac., 316; 16 Mass., 86; 92 U. S., 309; 31 Wis., 120; 39 Cal., 414; 28 Pac., 1067; 31 id., 800; 63 N. W., 760; 29 S. W., 650; 18 id., 1021; 62 N. W., 131; 53 id., 491; 7 Wall., 613; 26 Pac., 891; 49 id., 8; id., 173; Dillon's Mun. Corp., 188, 189.)

If the territorial statute is held to be valid, then it is insisted that the tribunal provided thereby to determine the amount of the indebtedness, to be apportioned, is the district court, and not the board of commissioners of the original county. The entire matter — the amount and legality of the alleged indebtedness — is for the court to adjudge and determine. The statute in reference to the power and duty of the court uses such words as " shall hear and determine." It would be inequitable to impose a liability for a void claim upon a new county. The report prepared, in pursuance of the statute, by the board of the parent county, can not be considered, in any sense, as a determination of the question as to the amount and validity of the debts of the county. If a debt is void, it is of no binding force upon the old county which incurred it, and can have no greater force as against the new county.

The delinquent taxes are an asset of the parent county,

and not an obligation of the new, and the new county should not be charged with any portion of them. They can not become of any benefit to the new county. If any loss is to be sustained on their account, it must be borne by the original county. (59 N. W., 488; 63 id., 760; R. S., Sec. 3812.)

All the warrants of Johnson and Fremont Counties issued after the constitution took effect, not having been paid out of the taxes for the various years, and without there being money in the treasury to pay them, are illegal and void by reason of the restrictions of the constitution. (80 Fed., 672; 41 Pac., 556; 19 So., 282; 44 Pac., 103; 10 id., 641; 87 Ill., 385; 84 id., 626; 52.) It is no part of the duty of the court to make or unmake, but simply to construe the constitution. (52 Wis., 37; 87 Ill., 395; 49 Pac., 409; 39 id., 485; 36 id., 318; 12 Sup. Ct. Reporter, 220; 19 So., 282.) There is no power in the court to impose a debt upon the new county beyond the taxes for the current year without a vote of the people. (19 S. E., 57; Const. Art. 16, Secs. 3 and 4.)

The statements of the old counties show the debts to be in excess of the constitutional limit. The burden of proof, therefore, is upon them to show that they are valid claims against the new county. (49 Pac., 23; id., 296.) As the new county was not a party to the actions wherein certain judgments were rendered against the respective parent counties, the former may go behind them for the purpose of showing the illegality of the claims which were sued on and passed into judgments. (53 N. W., 491; 45 Pac., 501.)

POTTER, CHIEF JUSTICE.

### STATEMENT OF THE CASE.

The County of Big Horn was finally organized on the 4th day of January, A. D. 1897. The territory embraced therein had formed a part of three several counties, viz.: Fremont, Johnson, and Sheridan. These proceedings

were instituted by the filing in the office of the Clerk of the District Court for Big Horn County of a report of the Board of County Commissioners of the County of Fremont, showing the amount of the indebtedness of that county, at the date of the organization of Big Horn County, and the other matters required by law in such cases. For the convenience of all parties interested the District Court, sitting within and for the new county, transferred the proceedings for further consideration to the District Court for the County of Sheridan, which is in the same judicial district and is presided over by the same judge. Subsequently, Johnson and Sheridan Counties filed in the District Court of Sheridan County similar statements, or reports, but each of them were entitled or denominated a "petition," evidently based upon the theory that the proceedings were of the nature of a suit against the new county. The error thus made, is, however, not material, as the statements are properly verified and may be treated as the reports authorized by statute.

It seems that the reports from the three counties were heard together, although separate answers were filed on behalf of Big Horn County. When the matters came before the District Court for consideration, certain questions arose deemed to be difficult and important, and were reserved to this court for its decision. So far as the claim of Sheridan County is concerned, we were informed upon argument that an amicable arrangement had been effected between that county and Big Horn County.

In 1882, the Legislature enacted a general law concerning the apportionment of county indebtedness upon the organization of new counties out of territory formerly included in another or other organized counties. Such provisions are now contained in sections 678 to 683 inclusive of the Revised Statutes of 1887. Section 678 provides that a newly organized county formed out of territory detached from any other duly organized county, or counties, shall be held liable for the payment of a just and equitable proportion of the indebtedness of such original county or

counties, existing at the time of the organization of the new county. The succeeding sections prescribe the rule of apportionment, and the method for the ascertainment of the indebtedness, and for determining the proportion thereof to be assumed by the new county. It is made the duty of the county commissioners of each parent county to ascertain from the records of such county the amount of its existing indebtedness, and to also ascertain the assessed value of the real and personal property of the detached territory from the last annual assessment, made before the establishment of the new county, and to also ascertain from said assessment the total assessed value of the real and personal property of the original county; "from which," it is then provided, "the proportion of said indebtedness which said new county shall bear, shall be determined, which said portion shall bear the same ratio to the whole amount of such county's indebtedness, as the assessed value of the real and personal property of such detached territory bears to the assessed value of the real and personal property of the whole original county, said assessed values to be ascertained as hereinbefore stated from the last annual assessment made before the establishment of the new county." (Sec. 679.)

The commissioners are thereupon required to immediately report to the district court of the district within which the new county is located, and the district court for such county if organized, and if not to the court in said district in some adjoining county, the amount of the indebtedness of such original county, the time when the same becomes due, the nature thereof, and the rate of interest thereon, together with the assessed values of the real and personal property of the detached territory and original county, also the kind, nature, value, and location of all public property of the original county, and all its moneys and credits, said report to be verified by the affidavit of the chairman of the board of commissioners making said report. The report is required to be accompanied with proof of the organization of the new county and a statement showing its boundaries. (Sec. 680.)

The court to which the report is made, or the judge
thereof in vacation, is required to cause a notice of the
making thereof to be issued and served upon the chair-
man of the board of county commissioners of the new
county, which notice must specify the time and place,
when and where said report will be heard and considered
by the court.   It is provided that all counties interested
shall have an opportunity to be heard in reference thereto,
and that the time for the hearing may be adjourned from
time to time in the discretion of the court, or judge in
vacation, and that the report may be heard and considered
and all proper orders made concerning the same in vaca-
tion by the judge of the court.   (Sec. 681.)

Section 682 is as follows: " It shall be the duty of said
court to which said report is made, or the judge thereof in
vacation, to determine upon the basis hereinbefore stated,
the proportion of the existing indebtedness which such
new county shall bear after deducting its proportion in the
same ratio of the value of all public property, moneys, and
credits of the original county; provided the court may, if
any of said public property is located within the limits of
any such new county, apportion the same thereto the value
of which on the said settlement shall be charged to said
new county, and shall order the board of county commis-
sioners of said new county to issue the warrants of said
county payable to the order of the original county and
payable at a time not later than the time when the afore-
said indebtedness shall become due, and bearing the same
rate of interest, to pay the amount of its proportion so as
aforesaid determined, and until the said proportion and
the warrants issued therefor shall be paid the said indebt-
edness of the original county shall continue to be a lien
upon the taxable property of said new county as before
the organization thereof. "

The board of county commissioners of the new county
is required, upon receiving the order of the court in the
premises, to at once issue the warrants of the county as
directed, and cause them to be delivered to the commis-
sioners of the proper county, and in each year when any

of such warrants become due to levy a sufficient tax upon all the real and personal property of the county to pay the same.    (Sec. 683.)

The original report of the commissioners of the county of Fremont shows that at the close of business on the third day of January, A. D. 1897 (the day preceding the date of the organization of Big Horn County), the existing indebtedness of Fremont County consisted of outstanding "funding bonds" amounting to $46,000, and $23 interest, and that said bonds carried six per cent interest, payable on July 1st and January 1st, each year.    The principal being payable, $4,600 January 1st, 1901, and $4,600 each year thereafter until the whole sum shall have been paid.    " Court-house and Jail Bonds," $5,000, accrued interest, $243, rate of interest eight per cent per annum — all past due.    " County warrants outstanding," $15,500. Accrued interest, $2,751.85.    Warrants not bearing interest, $283.49, all of which are alleged to be due according to law.    Judgments against the county, $34,473.75, accrued interest thereon, $1,310.10.    All of which are alleged to be due according to law.    Certificates of Indebtedness, $9,572.03, all payable out of the taxes for 1896 when collected.    Bills disallowed for want of funds — not sued upon nor in judgment, $2,055.67.    Bills on file, $846.75, upon which no action has been taken.    Due the State on taxes for 1894, $2,161.09, accrued interest, $339.96.    For taxes for 1896, $10,147.39.    Then follows a statement of public property consisting of a court-house and jail, sheriff's residence, etc., valued at $18,000. The report contains also a statement of credits embracing cash on hand to pay interest on funding bonds, $1, 418.61; principal and interest on court-house and jail bonds, $3,031.88; judgments and interest, $225.29; State taxes, $8,745.38.    Due from former treasurer, $1,401.10, or as found by State Examiner, $1,426.23.    Fees from county clerk's office, $171.70; taxes outstanding for 1896, and all prior years, including all levies (not segregrated) with penalty but without interest, $44,208.11, said taxes

including a proportionate amount levied on property and persons in the detached territory estimated at $13,500.00. Cash on hand in general county fund, $8,845.72. A supplemental report was filed showing all changes up to July 1, 1897. By this it appears that of the Certificates of Indebtedness, $7,157.59, had been paid, and new or additional certificates in payment of 1895 and 1896, claims issued amounting to $680.78. Interest on Funding Bonds, $1,380, was paid to July 1, 1897. $240 interest and $2,500 principal was paid upon courthouse and jail bonds. $435.96 and $98.64 interest was paid on warrants and $4,346.29 principal and $210.17 interest was paid on judgments. Additional judgments $13.78, in June, 1897, and $71.49 on July 5, 1897. $9,500 was paid the State on account of State levies. The supplemental report exhibited $40,346.55 delinquent taxes still uncollected. These reports are accompanied in the record before us by a schedule showing the amount and original owner of each judgment rendered against the county with the date thereof as existing August 31, 1897.

The assessed values of all taxable property taken from the roll of 1896, is given in the original report as follows: Valuation of real and personal property in the detached territory, $567,617.00. Valuation of the property of Wyoming and Midland Telegraph Company as fixed by the State, $1,120.00. Valuation of property on the Shoshone Indian Reservation, to restrain the collection of taxes on which a suit is pending in Supreme Court, $23,330.00. Total valuation of all property in the original county, $1,649,962.00, less $4,943.00 of erroneous assessments.

The commissioners of Johnson County reported that the indebtedness of that county on the 4th day of January, A. D. 1897, was as follows: "Court-house Bonds," $2,000.00. Accrued interest thereon, $160.00. Issued July 1, 1884, and payable in fifteen years from date, one-tenth required by statute to be retired each year after the second year. "Funding Bonds" issued January 1, 1891,

$74,000.00 bearing six per cent interest, payable as follows: ten per cent of the total issue January 1, 1901, and ten per cent of the remaining amount annually thereafter, making the last bonds redeemable twenty years from date of issue. Due the State on account of taxes for years 1895 and 1896, $1,704.72. County warrants and allowed bills, $3,562.94. Judgment rendered June 3, 1893, against the county, which is described with particularity, $6,685.37, with interest at twelve per cent per annum, the accrued interest amounting to $2,863.41. Total indebtedness, $90,976.44. The statement of the assessed values of the taxable property contained in the report, shows a total of $1,456,596.37, and in the detached territory, $330,859.44, making the proportion of the new county 22.71 per cent. It is also shown that the value of the public property consisting of court-house, jail, and jailer's residence, and court-house grounds is $20,000.00; and that there remains unpaid of the taxes levied prior to January 4, 1897, for that portion of Johnson County detached and incorporated in Fremont County, $5,627.47, in the collection of which the old county is hampered by distance and legal obstacles. The report makes claim of $16,081.74 from the new county as its due proportion of the indebtedness after deducting its proportion of the value of the public property. The report also contains a prayer for such order as may be just and equitable respecting said delinquent taxes.

The above rather comprehensive review of the two reports has seemed desirable if not entirely essential to an accurate understanding of the questions involved, and of the differences existing between the old and new counties as disclosed by the record and the reserved questions.

The County of Big Horn filed a separate "Answer" to the statement of each of said parent counties. In answering the statement made on behalf of Johnson County it is alleged generally that all the warrants, judgments, and certificates of indebtedness set out in the petition of Johnson County were issued in excess of the taxes for the cur-

rent year in which the same were issued, made, and incurred, and those issued in 1893 and 1894, were issued in excess of eighty per cent of the taxes for the current year, and all the warrants and certificates were issued when there was no money in the county treasury to pay the same. That, together with the prior existing indebtedness, they exceeded two per cent of the assessed valuation of said county for any and all the years during its existence; and that the bonded debt being for court-house, jail, and funding bonds exceed four per cent upon the taxable property and assessed valuation of the county for the years 1889 and 1890.

It is further alleged that the public property, moneys, and credits of the county were of the reasonable value of $40,000.00. The warrants are charged with invalidity, and that of the bonds but $58,268.84 could lawfully have been issued.

It is further alleged that no sum can be charged to Big Horn County for the reason as stated and charged, that the same would be in excess of the tax levy for the current year, that there is no money in the treasury to pay the same, and it would be in excess of the constitutional and statutory limit of indebtedness of said new county. It is also charged that the indebtedness to the State for taxes is not a proper charge against Big Horn County.

In the answer to the statement of Fremont County, like defenses are set up, except that no claim of invalidity is charged against the bonded indebtedness of that county. It is alleged that all of the indebtedness was incurred in 1893–4, and is illegal and void as having been incurred beyond the limit of two per cent on the assessed valuation of the property of the county for the years when the same was incurred, and the assessed valuation for the years of 1892 and 1893 is given, and the indebtedness of such year is also stated in an aggregate amount. The invalidity is also alleged to arise from the fact that there was no money in the treasury when the warrants were issued, that they were issued in excess of the taxes for the current year and

without any vote of the electors authorizing such indebtedness. The judgment debts are also alleged to be illegal for similar reasons. It is charged that Big Horn County was not a party to the actions in which the judgments were rendered, nor to the debts sued on, and that the new county was created out of Sheridan and Johnson Counties as well as Fremont. Similar claim of invalidity is made as respects the certificates of indebtedness mentioned in the report. It is alleged that the items of disallowed bills were void for like reasons, and that they constitute no charge against the new county on the ground that they have been disallowed by the commissioners of the said parent county. The items included in bills on file are discredited by similar allegations of invalidity, and the same objection is made to the amount due the State on account of taxes, as well as that there was more than enough taxes assessed for State purposes standing upon the tax rolls of Fremont County due and unpaid, to pay such State tax, and that Fremont County had neglected to collect the same.

On behalf of Johnson and Fremont Counties, respectively, motions were filed to strike the answer of Big Horn County from the files on two grounds; viz., for the reason that the answer contains no matters of fact that can be inquired into or investigated by the court in this proceeding, and for the further reason that the answer is indefinite and uncertain, and does not state in issuable form any fact upon which the court might act, even if the court is not precluded from investigating in this proceeding any of the questions raised in the answer.

On the 15th day of January, 1898, the district court made the following order reserving certain questions for the decision of this court.

" The matter of the division of the county indebtedness of the several counties of Johnson, Sheridan, and Fremont, and the determination of the portion thereof to be paid by the new county of Big Horn coming on to be heard, and the court finding that important and difficult questions

arise out of the matter aforesaid, reserves the same for decision by the Supreme Court, and certifies the questions reserved to that court for its determination."

The questions so reserved are stated as follows:—

" 1. Can the District Court upon the certification of the indebtedness of the old counties make any inquiry or investigation as to the legality of such debt, or is all inquiry as to the same precluded by the proper certification of the debt by the old counties ? "

" 2. In this case the County of Big Horn (that being the new county) has filed in this court an answer raising certain questions of fact, and among others alleging that the indebtedness of the county of Fremont, as shown by the statement filed by said county, with the exception of court-house, jail, and funding bonds, was incurred by said county in excess of the taxes for the current year in which the same was incurred, and that no vote of the people was had thereon.    That the said indebtedness was incurred, together with other prior indebtedness of said county, beyond the constitutional limit of two per cent upon the assessed valuation of the taxable property of said county, as shown by the assessment roll of said county for the year preceding the incurring of said debt. That the same was incurred, together with the other existing indebtedness of said county, in excess of the congressional limit of four per cent upon the assessed valuation of the property of said county for the year preceding the incurring of said indebtedness, and that the same was incurred and the warrants and certificates issued therefor when there was no money in the treasury to pay the same, to which the County of Fremont, by its counsel, has filed a motion to strike the same from the files, for the reason that the answer is indefinite and uncertain in its terms, and presents no defense to the claims of Fremont County, and no matter that can be inquired of by this court in this proceeding.    Question: Should the motion be sustained or overruled ? "

" 3. The same propositions presented by the claims of.

Johnson County, and the answer thereto by Big Horn County, that arise as to the claims of Fremont County. Question: Can the matter of indebtedness of Johnson County be questioned, disputed, or inquired into by this tribunal, or is the court wholly precluded from such inquiry by the claim of debt duly certified by the board of county commissioners of said Johnson County? "

" 4. Should the delinquent taxes due the parent counties from citizens and residents of the new counties, or levied against such residents of the new county by the county authorities of the parent counties prior to division, be considered in adjusting the indebtedness between the parent counties and the new county, and can the collection of such taxes be enforced by the new county and the money collected paid to the parent counties? "

" 5. Shall delinquent taxes on the tax rolls of the parent counties be considered an asset of the parent counties in adjusting the indebtedness of the parent counties with the new county? "

" 6. If the court finds that the proportion of the indebtedness due to the old counties from the new exceeds two per cent of the assessed valuation of the new county, can the court direct the board of county commissioners of the new county to issue warrants for such indebtedness in excess of the two-per-cent limit? "

" 7. Can the court direct the board of county commissioners of Big Horn County to issue warrants to the parent counties when there is no money in the treasury of Big Horn County to pay the same? "

" 8. Can the court direct the commissioners of Big Horn County to issue warrants to the parent counties in excess of the taxes for the current year? "

" 9. Can the court direct the commissioners of the new county to issue any warrants as against the taxes of any year for any portion of the indebtedness in question in this suit? "

" 10. Can the parent counties enforce an indebtedness against the new county that was incurred by the old coun-

ties in excess of the constitutional limit of two per cent since the adoption of the constitution, or that was incurred in excess of the taxes for the current year in which the same was created?"

"11. Shall this court in this case, in the division of the indebtedness between the parent counties and the new county consider the indebtedness evidenced by judgments against the parent counties whether the same were for debts or obligations contracted beyond the constitutional limit, or beyond the current taxes of the year, or when there was no money in the treasury to pay the same?"

OPINION.

## Validity of the Statute.

It is contended by counsel for Big Horn County that the statute above mentioned has not been in force since statehood, but was impliedly repealed by the provisions of the constitution relating to county organization. Art. 12, Sec. 2, of that article requires the Legislature to provide by general law for organizing new counties subject to certain restrictions therein specified. It further provides that, "in case any portion of an organized county or counties is stricken off to form a new county, the new county shall assume and be holden for an equitable proportion of the indebtedness of the county or counties so reduced."

The proposition relied on is that the constitutional provisions are not retroactive, but are applicable only to succeeding Legislatures, and that the provision above quoted for the assumption of a proportion of existing indebtedness by a new county is not self-executing.

Clearly, they are not retroactive. Perkins v. Board of Commissioners of Fremont Co., 5 Wyo., 166. The provision prohibiting the organization of a new county until it shall contain a population of at least fifteen hundred bona-fide inhabitants, was held, by this court, to be self-executing. Id. We are not prepared to say that the constitutional imposition upon a new county of a proportion-

ate share of existing indebtedness is not self-executing, but if we concede that it is not, and admitting the prospective character of section two, the result contended for by counsel does not follow. .

It is true that if a part of the territory and inhabitants of a county are separated from it by annexation to another, or by the creation and organization of a new county, the remaining part of the county retains its property and rights, and remains subject to all its obligations and duties, and responsible for the entire indebtedness of the original county existing at the time of the division, in the absence of a contrary constitutional or statutory provision on the subject. (Laramie Co. v. Albany Co. et al., 1 Wyo., 137; Laramie Co. v. Albany Co., 92 U. S., 307; 7 Am. and Eng. Ency. L., 2d ed., 912, 913, and cases cited.)

It was formerly held by some of the courts that the provision for apportionment, to be effectual, must be made in the same act by which the county is divided, and this court in territorial days, in the early case above cited, was led into an expression to that effect, although that particular question was not involved. The modern and more reasonable doctrine is that the provision may be made by general law passed previously to the act dividing the county, or such apportionment may be provided for after the enactment of the statute dividing the county either by a general law or by a special act, if that character of legislation is not in such a case prohibited. (7 Am. and Eng. Ency. L., 2d ed., p. 919; Perry Co. v. Conway Co., 52 Ark.; 430, 6 L. R. A., 665; Sedgwick Co. v. Bunker, 16 Kan., 498; State v. Kiowa Co., 41 Kan., 630; Forest Co. v. Langlade Co., 76 Wis., 605; People v. Alameda Co., 26 Cal., 642; Johnson v. San Diego Co., 109 Cal.; 468; 30 L. R. A., 178.)

In the case of Perry Co. v. Conway Co., supra, the court said: "The better doctrine is, that the power of the Legislature to impose the debt of one county upon another depending upon the existence of a moral obligation from the new county, or the county receiving new territory, to

pay part of the old debt, the Legislature may so ordain whenever it finds the moral obligation to exist."

The supreme court of Wisconsin expressed its views with reference to a general law covering the subject, as follows: "It is true that by Ch. 334, Laws of 1885, the Legislature did, by a general law, fix the rights of the counties, towns, etc., when formed from other towns, or counties, and such general law would probably be held to govern when the Legislature thereafter made any divisions of, or created new towns or counties, and made no declaration in the acts dividing or creating the same as to what their relative rights and liabilities should be." Forest Co. v. Langlade Co.; supra. Subject only to constitutional declarations, the rule for the apportionment of debts and property between an old county and a new one composed partly or wholly of territory taken from the old, belongs exclusively to the Legislature, and its power in such case to divide the common property and burdens in such a manner as may seem to it just, reasonable, and equitable, and to compel taxation for that purpose, is well established. (7 Am. and Eng. Ency. L., 2d ed., 914, 915, and cases cited.)

At the time of the enactment of the territorial statute (Secs. 679–683 Rev. Stat., 1887) the same was clearly within the power of the Legislature. By section three of Article 21 of the constitution it is provided that, "All laws now in force in the Territory of Wyoming, which are not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered, or repealed by the Legislature."

The basis upon which the proportion of the indebtedness of the old county to be borne by the new is by the statute required to be determined is that usually adopted by the other States, and has been uniformly recognized as just and equitable. No declaration or rule of the constitution is therefore violated, and the statute presents no repugnancy in that respect. Such a law could be enacted by the State Legislature without successful challenge on the

ground of its conflict with the constitution. Had the latter been silent upon the subject, the Legislature would, nevertheless, have possessed ample authority in the premises. A constitutional permission or command was not essential or required. It is, therefore, immaterial whether the constitutional declaration is self-executing or otherwise.

The validity of the statute is further questioned if its effect is to permit such an apportionment of the debts of the parent counties as to impose upon the new county a burden in excess of the constitutional limitations upon county indebtedness, having regard to the assessed property valuation and condition of the new county; and the matters in detail pertinent to this contention are embraced in the reserved questions numbered six to nine, both inclusive. The contention in this respect rests upon the provisions of Sections 3 and 4 of Article 16, of the constitution. They are as follows: "No county in the State of Wyoming shall in any manner create any indebtedness, exceeding two per centum on the assessed value of taxable property in such county, as shown by the last general assessment preceding." (Art. 16, Sec. 3). "No debt in excess of the taxes for the current year shall, in any manner, be created by any county or subdivision thereof, or any city, town, or village, or any subdivision thereof, in the State of Wyoming, unless the proposition to create such debt shall have been submitted to a vote of the people thereof, and by them approved." Art. 16, Sec. 4.

If the provision of the constitution already alluded to respecting the assumption of indebtedness by a new county upon the excision of a part of the territory of another county to form such new county is not self-executing, it is at least a positive and express authorization of the imposition of a proportionate burden upon a new county, and its effect is, necessarily, the exclusion of the debt to be so assumed by such new county from the restrictive provisions of Art. 16, above quoted. It is reasonably certain that the requirement for an assumption of an equitable share of the debts of a parent county ap-

plies only to a new county when organized.    Until then
it is not in a condition to assume or pay such indebtedness.
The act under which the new county was organized was
passed in 1895, since the adoption of the constitution.
It was general, and applied to all new counties theretofore,
or thereafter created and formed.

That act is silent concerning the apportionment of
indebtedness, the Legislature evidently recognizing and
being satisfied with the law as it appeared in the Revised
Statutes.    To hold that such silence permitted the organi-
zation of the county, and the consequent final and perma-
nent segregation of its territory from the county or
counties to which it previously belonged, without any
responsibility for the burdens to which such territory was
theretofore subject,would amount to the destruction of the
constitutional declaration, and render the same meaning-
less or liable to be controlled entirely by legislative dis-
cretion or caprice.    To require the new county to assume
and pay an equitable proportion of the existing indebted-
ness of the parent counties, even should such proportion
exceed two per cent upon the valuation of its taxable
property, or should be in excess of the taxes for the cur-
rent year, or be assumed when the treasury was without
funds, does not constitute a violation of any constitutional
provision ; such a debt is not affected by the limitation
upon county indebtedness.

Moreover, the same conclusion is reached from a con-
sideration of the character of the indebtedness, and the
proportionate liability therefor, independently of the con-
stitutional requirement for the imposition of the burden
upon the new county.

The indebtedness for which the new county is holden is
not a new burden.    No new debt is created.    There is
merely a division of one already existing.    Sedgwick Co.
v. Bailey, 11 Kan., 631; Canova v. Com'rs, 18 Fla., 512;
Vance Co. v. Granville Co., 107 N. C., 291.    In Canova
v. Com'rs, supra, the supreme court of Florida, consider-
ing a like question, said: "The act of the Legislature,

therefore, did not create an indebtedness and impose it upon Baker County; but intended that its due proportion of the debt should be paid by it as though there had been no division of the parent county." In Vance Co. v. Granville Co. a kindred question was before the supreme court of North Carolina, and was disposed of by the court in the following language, "This provision created no new or additional liability; it simply continued an existing one, for the present purpose as to the outstanding public debt of the county of Granville contracted before the enactment of this statute. . . . As to this debt, that part of the county of Granville which became a part of the county of Vance, the citizens and taxable property embraced by it, continued to be, in effect, a part of the county of Granville. The intention was that the liability should continue to exist just as if the citizens and taxable property were still, and notwithstanding the erection of the county of Vance, part of the county of Granville."

Under this construction the county of Big Horn is not the victim of any injustice. It assumes that which it ought equitably to assume. Neither will the new county government be hampered in the conduct of its current affairs. It is clear that the liability and the warrants which may be issued in satisfaction thereof will constitute part of the public debt of the county for the payment of which taxes may be levied in addition to the tax authorized for current county revenue. The debt thus assumed will not operate as a charge only upon the funds raised by the limited tax for county revenue. The constitution places no limit upon taxation for the payment of the public debt· and in that class this indebtedness, for which the new county is holden, must be held to fall. Such a view is so obvious that we deem any further discussion thereof unnecessary.

It is further insisted that the act of 1893, Ch. 33, prevents the entertainment of these proceedings. That act requires all claims held by any person or corporation against a county to be presented for audit and allowance

to the board of commissioners, and prohibits the issuance of county warrants, payable on demand, when there is not sufficient moneys in the appropriate funds for their payment, but authorizes the county, under certain conditions, to issue warrants or orders in anticipation of taxes already levied to the extent of .eighty per cent of the respective funds.

That statute has no reference or application to the adjustment of debts and property between an old and new county. The claim of the old county for contribution is not one for presentation to or allowance by the board. The act of 1893, although the latest expression of the Legislature, can not be construed as an implied repeal of the special provisions for the apportionment of county indebtedness upon the division of territory. Under familiar rules of statutory construction both statutes can stand, and are controlling within their respective fields.

### Answer to 6th, 7th, 8th, and 9th Questions.

Our answer to the sixth, seventh, and eighth questions is, for the reasons above set out, in each instance, in the affirmative. With reference to the ninth question, if we understand its purport, the court is of the opinion that the order would not in terms require the commissioners of the new county to issue warrants against any particular taxes, or against those for any particular year; but the warrants would be ordered payable at the time, or times, as required by the statute. That statute is sufficient in itself as to taxes. In requires the county in each year when any of the warrants become due to levy a sufficient tax to pay the same.

### The Tribunal and Its Jurisdiction.

The first, second, and third questions involve the right of the new county, in the apportionment proceedings to challenge the validity of the reported indebtedness.

It is asserted by counsel for one of the new counties, with much earnestness, that the Legislature, possessing

primary plenary power over the subject, has designated the board of commissioners of the parent county as the tribunal to ascertain and determine the indebtedness, and that the court is without discretion in the premises, but is bound to implicitly accept the report and make its calculations therefrom.    In other words, the contention is that the reports are conclusive.

Counsel for the new county go to the other extreme, and with equal seriousness insist that the court is the selected tribunal, having ample authority to enter upon an investigation of the original power of the county to contract or incur the debts specified in the report, and to discard all which are found to have been incurred without lawful authority; notwithstanding that the claims have been regularly allowed by the constituted authorities of the county, and that the report truthfully represents the showing made by the records upon which they are required to be based.

We are not satisfied with either view.    To say that the court must accept without question the reported indebtedness signifies that no inquiry is permissible, even if the records do not in fact disclose that the bonds or warrants mentioned in the reports have been issued, or the claims therein certified, allowed, or recognized as debts.    Suppose that the new county should interpose an objection to the reports on the ground that but $50,000 of bonds instead of $74,000 had in fact been issued by Johnson County.    Is it possible that the reports are so conclusive as to require the new organization to pay for bonds which never had an existence?    If the records are charged to have been falsified, is the court powerless in such proceedings to investigate the matter?    We think not.    It will not do to say that the whole matter has been determined by the commissioners in making their report, nor does the statute reasonably bear that construction.    All counties interested are afforded an opportunity to be heard; a very doubtful right if the determination has preceded the hearing.    We are more inclined to construe the statute as designating the

court as the tribunal not only to perform the clerical work of calculation, but to make such ultimate determination in the premises as the proceedings authorize.

It does not follow, however, that even the court may inquire whether the debts so certified were incurred in violation of constitutional or statutory limitation upon the aggregate amount of indebtedness. The court in these proceedings is without jurisdiction to enter upon such an investigation, but not on account of any conclusive qualities of the reports of the commissioners. The lack of jurisdiction we find to result from altogether different considerations. In the first place the proceedings are not of the character of a suit or action at law or in equity to enforce an obligation due from the new to the old county. The obligation of the new county is not founded upon contract either express or implied. (Phillips Co. v. Lee County, 34 Ark., 240.) Ample power resides in the Legislature to require an adjustment of the burdens resting upon the old county, and no consent of the one newly organized is necessary for the exercise of that power. The proceedings are instituted in pursuance of legislative directions for the purpose of effecting such an adjustment. It has been held that the Legislature may itself ascertain and determine the ratable proportion of existing liability to be assumed by the new county. (In the matter of House Bill No. 231, 9 Colo., 624; 7 Am. and Eng. Ency., L., p. 920.) It is, however, competent for the Legislature to commit that matter to the appropriate local authorities, or to a commission or board. (Id.) The selection of a regular judicial tribunal is not essential. The weight of authority, although there are conflicting decisions, probably recognizes as a correct doctrine that if the authorities or board so selected should fail or refuse to perform the duty, or if no proceedings have been provided for the ascertainment and apportionment of the debt, the parent county may enforce the obligation of the new county by an action at law. (7 Am. and Eng. Ency., L., 921; Grant Co. v. Lake Co., 17 Or.,

453; Vance Co. v. Granville Co., 107 N. C., 291; see also Chickasaw Co. v. Clay Co., 62 Miss., 325.) In Texas a suit at law is the remedy provided by statute, and the courts of that State in such a suit assume jurisdiction to adjudicate upon the validity of the debts, and refuse to apportion such as are found to have been illegally incurred. Hardeman Co. v. Foard Co. (Tex. Civ. App.), 47 S. W., 30. The power to make the investigation is probably found by the courts of that State to arise from the nature of the action, which, being a suit at law, requires the complaining party to make proof of the existing indebtedness, in order to show an obligation of the new county. A contrary view is taken in another State, where the remedy pursued was by bill in chancery, and we think with sounder reason. Chickasaw Co. v. Clay Co., 62 Miss., 325.

The power of the court in this State to entertain these proceedings does not arise out of its general jurisdiction, but is derived through special statutory provision. The matter rests originally with the Legislature, and the duty of the court is to see that the legislative will is carried out.

In pursuance of the limited and special jurisdiction conferred upon it, the court is required to determine the proportion of existing indebtedness to be assumed by the new county. This involves, primarily, an ascertainment and determination of the amount of indebtedness. It may be conceded, also, that as a fundamental proposition, only the valid indebtedness is to be apportioned. This, however, has its limitations. The matter of authorized evidence is to be considered, as well as the field covered by the statutory proceedings, and further, the relation of the new county to the debts shown to exist by the records of the old county and recognized by it as legal and binding.

Strictly speaking, the new county, prior to apportionment, is not a debtor of the old. Forest Co. v. Langlade Co., 91 Wis., 543. Neither is it, in strictness, a debtor to the respective holders of the obligations of the parent county. It is a representative of certain territory and the

inhabitants thereof formerly liable for all the debts binding upon the old county at the date of the organization of the new, and the people in the constitution have declared, and the Legislature has willed, that it shall assume the burden heretofore resting upon that territory recently brought within its jurisdiction. This leads us to another proposition; viz., that whatever debts are binding upon the parent county are proportionately binding upon the new.

It is perfectly obvious that, in these proceedings, no jurisdiction resides in the court to vacate or cancel any of the evidences of indebtedness issued by the old county. No order made herein can in any regard, as between the parent county and its creditor, affect the validity or apparently binding nature of a single bond, warrant, or certificate of indebtedness. Should the court entertain the idea that any warrant or bond, or set of warrants or bonds, were illegally issued, and should refuse to apportion the amount thereof, the old county would not in any sense or degree be thereby relieved from responsibility upon them. Unless a defense of illegality should be interposed and sustained in a suit upon the claims against the old county, the creditor would be entitled to judgment, notwithstanding that his claims have been disregarded in making apportionment between the old and new counties. It would seem, therefore, that every principle of justice prohibits the inquiry in this case, unless the jurisdiction and authority clearly appear.

The asserted illegality does not depend upon anything contained in the reports, or even in the record of the allowance of the claims, or issuance of the evidences of the debts, but upon extrinsic matters of fact. It is to be assumed that the obligations are such as may ordinarily be contracted by a county limited only by its financial condition. Prima facie, they are valid and legal, and collaterally must be so considered and dealt with until they are discredited by a competent tribunal. 2 Dillon's Mun. Corp., 4th ed., Sec. 502. Judge Dillon says in the sec-

tion cited, that the officers will be presumed to have done their duty.

At the time of the organization of the new county, the territory therein, formerly a part of the old, was subject to the indebtedness of the old county to the same extent as the remaining territory of that county. The same debts which constituted a charge upon the other territory of the old county in like manner and to precisely the same effect amounted to a charge upon it. If those debts continue in respect to the old county and the territory retained within its boundaries, it likewise continues upon the segregated territory until the due proportion thereof shall be assumed and paid by the new county.

This liability of the detached territory is expressed not only in the statute providing for the apportionment, but is emphasized in the provisions of the county funding act. Laws 1888, p. 44, Sec. 4.

If it be true that the court can not, by any order herein, absolve the parent county from its record indebtedness, is it fair or just that the territory which it has parted with should be relieved? It seems a reasonable conclusion, in the present condition of our laws, that the authority no more exists as to the detached territory than as to the county itself.

Should it hereafter occur that any of the record debts assumed by the new county be adjudged, by a competent court, illegal and of no binding effect upon the parent county, and they are repudiated, ample power resides in the Legislature to afford a remedy to Big Horn County, if none now exists. Possibly, equity is capable of giving relief in the absence of special statutory regulation, but a decision upon that matter is not called for at this time.

The division of the county has not operated to alter the situation of the separated portion thereof with respect to its obligations. The discussion of another feature of this case will disclose that under statutes continuing the liability of detached territory for the debts of the parent county where no provision for a single settlement has been made,

the corporate authorities of the debtor county are authorized to enforce such liability by taxation of the property in the detached, as well as in the remaining, territory.

Other considerations operate, perhaps more forcibly, to confine the court, in its determination herein, to the apparent record indebtedness of the parent counties. The taxpayers of the excised territory possess no rights or privileges in relation to the county affairs and liabilities, superior to the taxpayers who continue to be residents of the county. The statutes do not express or reveal an intention to create a favored class of the inhabitants or property attached to the new county.

In Vance Co. v. Granville Co., supra, the North Carolina court said: "And in ascertaining and determining the proportion of the debt to be paid by the citizens and taxable property, so in the county of Vance, they should be treated as if in Granville County; they are neither to be favored nor discriminated against in ascertaining the outstanding debt, or the part of it to be paid by them."

To what extent are citizens and taxpayers of a county bound by the apparent outstanding indebtedness, represented by bonds, warrants, and other evidences of indebtedness? What are their remedies, if any, for illegal corporate action?

The board of county commissioners has power to examine, settle, and allow all accounts chargeable against the county, and when so settled, and allowed, to issue county orders therefor, as provided by law. Rev. Stat. Sec. 1801. All claims when allowed shall be paid by county warrants or orders drawn by the board upon the treasurer upon the proper funds. Warrants payable on demand are to be drawn and issued only when, at the time, there shall be sufficient funds in the appropriate fund to pay the same. If there are no moneys in the treasury to the credit of the proper fund, to meet and defray the necessary expenses of the county, it is lawful for the board to provide that warrants or orders may be

issued and drawn against and in anticipation of the collection of taxes already levied for the payment of such expenses, to the extent of eighty per centum of the respective funds. Such warrants are payable solely from the fund on which they are drawn, and the taxes levied to form the same when collected. When issued, the warrants last named are deemed to have been accepted in full payment and satisfaction of the claim to pay which they have been issued. Taxes provided by law for the fund upon which the warrants are drawn are required to be covered into the fund until all warrants drawn thereon shall be fully paid, both principal and interest. Laws 1893, Ch. 33, pp. 62, 63.

Negotiable coupon bonds for the funding of county indebtedness may be issued by the board. Laws 1888, Ch. 27, p. 42; Laws 1890, p. 45.

Again, when there are not sufficient funds in the county treasury to meet the obligations of the county as they mature, the board is authorized, by law, to issue certificates of indebtedness for current expenses, payable out of the taxes collected for the current year, and having preference over other evidences of indebtedness, including warrants. They are required to state that they are payable out of the revenues for the year of their issuance. The board is required at their meeting in January, or as soon thereafter as possible, to compute the estimated expenses of maintaining the several departments of county government for the current year, and to appropriate so much money from the several funds as may be necessary to pay such expenses, and it is made unlawful to issue any certificate, warrant, or other evidence of debt, in excess of the *anticipated* taxes for county purposes for the current year. Laws 1895, Ch. 106, p. 243.

Ordinarily, then, the county board is empowered, not only to audit and allow claims, but to issue bonds, warrants, and certificates of indebtedness. All the bonds were issued prior to 1893. There is a limitation by statute, upon the amount of warrants and certificates which may

be issued; but the general authority to issue exists; the limitation upon the power depending upon the consideration of matters affecting the income and financial condition of the county.

As to all pre-existing debts the board of the parent county is the agent and representative not only of the taxpayers and citizens remaining within its reduced boundaries, but as well of those within the territory recently belonging to it, but now separated from it. The board represented the entire county as at the time existing. Chickasaw Co. v. Clay Co., 62 Miss., 325.

It is true that the board can not lawfully allow any claim not authorized by law. It is also true that if it does so, and afterward pays the claim, in the absence of any steps having been taken to vacate the order of allowance or to procure the cancellation of the order issued thereon, the individual taxpayer is remediless. Prior to payment the taxpayer has, by the weight of authority, a remedy by injunction to prevent the unlawful act, either of allowance, issuance, or payment of the order or warrant, and to secure the vacation thereof. 2 Dillon's Municipal Corp., 4th ed., Secs. 914–922.

Under certain conditions another remedy may be open to the taxpayer. If a tax has been levied for the single purpose of providing a fund for the payment of an invalid claim, the courts would probably entertain a bill to restrain its collection. With reference to the debts assailed in this case, the right to such redress is at least doubtful. It has been held, and it seems to be established law, that when an amount of money which has been misappropriated is subsequently needed for legitimate purposes, a citizen can not resist the necessary tax to raise the same, because the public authorities have at a previous time misappropriated money. Dillon's Mun. Corp., 4th ed. Sec. 917, and cases cited.

In this State in case the county board should levy a tax for current revenue to the maximum limit allowed by law, it is evident that the tax would be lawful, and applying

the above analogous principle, its collection could hardly be successfully resisted upon the claim or fear that it was the intention of the board to use the proceeds in wrongfully discharging a debt alleged to have been unlawfully incurred. In the matter of bonds, a majority of them are conceded to have been properly issued. A tax levied to pay, generally, interest and a part of the principal of funding bonds, would not be unauthorized, and the remedy would not consist in restraining its collection, but rather in the application of the proceeds, unless, indeed, none of the outstanding bonds were legal.

The pending proceedings do not embrace, or sustain any relation to, either of the remedies alluded to, and recognized by the authorities.

In the audit and allowance of claims the county board necessarily determines that it is a legal and binding obligation; and that determination involves the conclusion that the debt is not only one which may usually be incurred, but that it is also permitted or not prohibited by constitution or statute. We observe no reasonable distinction between a claim or obligation tainted with invalidity because of the debt limitation, and one which the board for any other reason has no right to allow. The court would have the same right of investigation in either case.

In Chickasaw Co. v. Clay Co., supra, it was said, speaking of the character of the determination of a board of supervisors:—

" In the exercise of such jurisdiction, the fact of the indebtedness of the county, as constituted at the time when the contracts were made and performed, was necessarily determined, and there is nothing in the act creating the new county indicating a legislative intent that such determination should be less binding upon the excised territory, or upon the county into which it has been incorporated, than upon the territory which remained in the old counties."

That case decided that the validity of the debts in question were not required to be proved anew against the new county by the old. Those debts, however, were

such as had either been paid by the old county, or had passed into judgment. It was, nevertheless, held, in that case, that as to all pre-existing debts the action of the old county was binding and conclusive upon the new, and bound and concluded it to the same extent that it bound and concluded the taxpayers of the original county.

The statute providing the rule of apportionment does not reveal a legislative design to furnish an additional mode of redress for wrongful corporate action to the taxpayers in the detached territory. Certainly none is there given to those continuing in the old jurisdiction.

The records are constituted the evidence from which the debts are to be ascertained by the board and reported to the court.

The conclusion is strongly impressed upon us that until adjudged illegal, or set aside by a competent body or tribunal, the various claims allowed by the constituted authorities of the parent counties, and represented by the various evidences of indebtedness outstanding against the county, as well as those allowed not represented by warrant, order, or certificate, must be considered as, in all respects, valid and binding as against the county and its remaining taxpayers, and also against the inhabitants of the detached territory, and the new county. The court is precluded from inquiring into the facts alleged in the answer assailing the legality of the allowed debts, bonds, warrants, and certificates of indebtedness, which under existing circumstances stand as binding obligations.

The supreme court of Idaho reached a similar conclusion, but for other reasons. It was there decided that the board selected to make the apportionment performed clerical acts only. That case is relied on by counsel for Johnson County. Blaine Co. v. Smith, 48 Pac., 286. We prefer to rest our decision upon other grounds.

### Judgments.

The indebtedness reported by both Fremont and Johnson Counties includes judgments rendered against the parent counties respectively.

It has been heretofore held by this court that a judgment against a county, rendered by a court of competent jurisdiction is conclusive as against a collateral attack by the county itself or a citizen or taxpayer thereof, and it was said, " The validity of the debt was, or could have been, fully litigated in the suit in which the judgment was secured." Grand Island & N. W. R. Co. v. Baker, 45 Pac., 494. We adhere to that view, and it is well sustained by the authorities. Such judgment is equally binding upon the new county. Chickasaw Co. v. Clay Co., supra; Mount Desert v. Fremont, 72 Me., 348; Hughes v. School District, 72 Mo., 643. It is true that the new county as such was not a party to the actions, but the inhabitants of the territory which it has received were inhabitants of the original counties, respectively, when the judgments were rendered, or the claims accrued upon which they were founded, and they were bound by the judgments the same as all other inhabitants of such counties. Moreover, for reasons already given in this opinion, as the judgments are conclusive and therefore binding upon the original counties, they are likewise conclusive and proportionately binding upon the new.

The court, therefore, is precluded from inquiring into the validity of the claims which have passed into judgments; and our answer to the eleventh question, which particularly refers to such indebtedness, must be in the affirmative; and that it is the duty of the court to consider such judgment indebtedness.

### *State Tax.*

The old counties report an indebtedness due the State for deficiency in taxes levied for State purposes. The statutes relating to public revenue provide that each county shall be responsible to the State for the amount of the State tax levies. Rev. Stat., Sec. 3836. The answer of Big Horn County attacks that indebtedness in the Fremont County matter by alleging that the same, together

with the prior county liabilities, is in excess of two per cent of the assessed value of the taxable property; that when alleged to have been incurred, there was no money in the treasury, and that it was in excess of the current taxes for the year of its creation, and no vote of the people was had thereon. It is further asserted, however, that there are more than sufficient unpaid taxes on the rolls of the county assessed for State purposes to pay said State tax, which the county has neglected to collect. It is not stated that they are uncollectible. As to Johnson County, the answer merely alleges that the item of State tax is not properly chargeable to Big Horn County.

It is evident that the liability of the county for State taxes, which have been collected, is not inimical to any constitutional declaration. The question whether any right exists in the Legislature to fasten the debt upon the county for the amount of the State levy remaining uncollected, is not presented to us in the case at bar. None of the questions specially refer to this item of indebtedness.

The question is before us in another case which is now under advisement, that of the State v. The Board of County Commissioners of Laramie County.

The extent to which our decision is required in relation to the matter in these proceedings is the jurisdiction of the court to inquire into it. What has been remarked respecting bonds, warrants, and certificates of indebtedness does not apply unqualifiedly to this character of indebtedness. If it exists at all, it does not depend upon any act of the county authorities either as respects its creation, audit, or allowance. It is purely of statutory origin. In case such a debt, because of some constitutional prohibition, is incapable of creation under any circumstances whatever, it is clear that the court should refuse to apportion it. If, on the other hand, the liability is one which ordinarily is authorized and legal and capable of being defeated only by some matter of fact to be interposed by way of defense, while we do not

regard the question as free from doubt, the result of our best judgment is that the court in these proceedings would be precluded from inquiring into its validity; the county recognizing the debt and the court being powerless, by any order herein, to bind the State, or relieve the county from such apparent indebtedness, or from the necessity of payment

### Delinquent Taxes.

The fourth question inquires whether the delinquent taxes due the parent counties from citizens and residents of the new county should be considered in adjusting the indebtedness. Counsel for the new county seems to understand this question as referring to such taxes as debts rather than assets; and we gather from their brief that the question supposed to be presented is, whether the taxes thus due from those formerly in the old but now in the new counties should be given the character of a debt of the old county subject to apportionment to the new. It is possible that the question is entitled only to that construction, but we construe it as relating to any kind of consideration to be accorded such taxes — either as debts or assets. That the unpaid taxes are not debts, even if lost to the old counties, we conceive to be obvious. Its warrants and certificates of indebtedness, the former possibly and the latter certainly, issued in contemplation partly of the taxes assessed against property now in the new county, we have held, must be proportionately compensated for by the new county. There is no reason apparent to our minds why the latter should also pay a part of the taxes due from its citizens to the parent county.

The latter part of the fourth question inquires if such taxes can be enforced by the new county and the moneys collected returned to the parent counties. That will be considered in discussing the fifth question which presents the inquiry whether delinquent taxes on the rolls of the parent counties shall be considered as an asset of such counties. If the fourth question also refers to or includes

the credit character of the taxes mentioned therein, as we are inclined to believe it does, it will in that respect, be determined in connection with the fifth.

We conceive to be represented in the fifth question as well as in the fourth and fifth considered together, a legal question twofold in character. First: It involves unpaid taxes assessed against property remaining in the county; and second, taxes upon property which, since the division, and resulting therefrom, is located in the new county.

As a general proposition, we think it must be conceded that uncollected taxes, which when paid to the county will constitute a part of its revenue are assets or credits. Taxes levied for common school purposes, or special levies for school districts, which when collected are payable only to the various districts are not to be regarded in the apportionment. The proceeds of such taxes do not swell the county revenue, and are not employed in the conduct of the ordinary county affairs, nor in the discharge of its financial obligations.

Taxes levied for State purposes should operate as assets of the county, a proportionate share of the value of which ought to be credited to the new county, provided the debt of the old county for deficiency due the State is accounted as an indebtedness. Otherwise not. If the new county is not compelled to assume any liability for the deficiency due the State, it is not entitled to share in the taxes still due upon the State levies.

The extent to which the delinquent taxes are to be computed as assets ought not perhaps to be determined by the aggregate amount upon the rolls. The collection of some of them may possibly have been enjoined by a court of competent jurisdiction. Others, especially for former years, may have become absolutely uncollectible by reason of removals of persons and property from the State. In Forest Co. v. Langlade Co., 91 Wis., 543, the court said in substance, that it was doubtless the legislative intention that all matters of property, debts, credits, assets, and liabilities of the

parent county should be adjusted, upon principles of justice and equity, rather than by any technical rules of strict law. Strict rules of law are difficult of application to such matters and often produce unfair results. That no relation of debtor or creditor in any strict sense existed between the old and new counties; and that what is just and fair is more to be regarded than the application of strict rules of law.

We are inclined to approve that interpretation of the law. *Prima facie,* no doubt, all the taxes shown upon the rolls are valid and collectible, and should, in the absence of any showing to the contrary, be so presumed. The statute seems to contemplate that the value of the credits is the matter to be taken into account. Generally, then, the value of the delinquent taxes subject to the exceptions above noted, stand as an asset for appropriate consideration in making the ultimate award.

Following this principle, if the taxes lawfully levied upon the property in the detached territory has gone beyond the collecting jurisdiction of the county by reason of the division, and the county which levied the tax has been deprived of the revenue originally anticipated therefrom, the amount thereof should not be given a place in the column of assets. In such case it would not, in fact, constitute an asset or credit. The question, however, goes to the root of the matter. Should the taxes due from persons and property, now in the new county solely because of the division, be adjudged an asset? The solution of that issue depends upon whether the power of collection exists, and whether when collected the proceeds will belong to the original county. This raises a question of much importance and difficulty.

Our scheme of apportionment does not contemplate a joint or several liability of the two counties to the individual creditors. So far as the entity of the debtor is concerned, the old county remains the responsible party, but is allowed compensation for its due proportion from the new county. Neither is there in the contem-

plation of the statute a change to be effected in ownership of moneys and credits.   The old county retains them, but the due proportion thereof is to be deducted from the share of the debts for which the new county is holden. No provision is made for any transfer of moneys and credits from the old to the new county.   This is peculiarly true of the matter of taxes.   The law has not provided for their assignment to the new county, nor authorized the latter or its officers to collect them.   Following the fundamental principle which, in the absence of adverse legislation, invests an old county, upon a division of its territory, with all the public property, rights, and credits, and continues its liability for the entire amount of corporate debts, it has become well settled that the old county is entitled to the taxes assessed prior to the separation.   Cooley on Taxation, 2d ed., 239; 7 Am. & Eng. Ency. L. 2d ed., 913, and cases cited.   Judge Cooley says: "It will also retain the right to proceed in the collection of the taxes previously voted, and they will belong to it though collected in part from the territory now set off."

The law should, if possible, receive that interpretation which will not operate to deprive the old county of its tax revenue once lawfully provided for.   It may have issued warrants against it, or certificates of indebtedness in its anticipation.   Justice to all citizens and property moreover require that the tax payer, who resides and owns property in the detached territory, should not be relieved of the burden of government, and from the tax legally levied against him and his property.   A construction which would operate to relieve him, on no other ground than that there has been a county division, is certainly to be avoided if permissible.   The tax ought to be preserved, together with the power of enforcement.

There is no dispute among the authorities but that the tax remains an obligation due to the county levying the same.   Nor that if the person assessed has property in the present county, the tax may be collected therefrom. But, is the jurisdiction of the collector of the parent

county confined to the reduced limits of his county? On
the third day of January, 1897, his warrant and authority
covered the detached territory. Did it cease as to such
territory on the succeeding day?

Not only do the unpaid taxes remain due and belong
to the old county, but a tax lien is created by our statute.
Taxes upon real estate are made a perpetual lien thereon;
and taxes due from any person upon personal property
are a lien upon the real property owned by such person.
Revised Statutes, Sec. 3819. Taxes levied on personal
property are likewise a lien upon the property assessed.
Rev. Stat., Sec. 3844. Are those liens enforcable upon
the property subject thereto, now located in the excised
territory, or have they lost their practical vitality? No
provision has been made for the foreclosure of tax liens in
the courts. The whole proceeding for the collection of
taxes, distress, and sale of property, is summary, and
conducted solely by the collector.

Immediately following the annual levy by the county
board the duty devolves upon the county clerk to prepare
a tax list, the form thereof being regulated by statute, and
to attach thereto his warrant requiring the collector to
collect the taxes, therein levied, according to law. The
same is then required to be delivered to the collector, and
it constitutes sufficient and full authority to the collector
in the premises. Rev. Stat., Secs. 3806, 3807, 3808,
3811, 3812, 3820. In the collection of delinquent taxes
he may distrain and sell personal property. Secs. 3813,
3818. He may advertise and sell real property for
delinquent taxes assessed against it, and also for such
personal taxes as are a lien thereon.

Section 3808, provides: "The collector, on receiving
the tax list and warrant shall proceed immediately to col-
lect the taxes therein levied." Originally, no provision
of the statute expressly confined the operations of the
collector to his own county, nor authorized him to go
beyond that jurisdiction. General language only was
employed in defining his powers and duties in respect to

the locality for the exercise thereof.   In 1884, in regu-
lating the taxation of personal property coming into the
State subsequent to the completion of the annual assess-
ment, it was provided that in case the collector had any
cause to believe that any property subject to assessment
and taxation under that law was liable to be removed
from the county before payment of the tax, he should
have power to take possession of and detain so much of
such property wherever found within the limits of this
territory (now State), as would probably be necessary to
pay the taxes and cost of keeping.   Rev. Stat., Sec.
3847.   In 1888, a statute applying generally to personal
property assessed was enacted as follows:—

"In case the treasurer shall have reasonable grounds
to believe that any person having personal property upon
which the taxes are unpaid shall be about to remove
out of the county, or be in any other manner seeking to
put his personal property out of the reach of the treasurer,
it shall be the duty of the treasurer to collect such taxes
by distress, at any time after the tax list has been placed
in his hands.   In case any person owing taxes shall remove
or attempt to remove, his personal property to any other
county, the treasurer shall, among other steps to collect
such tax, forward, when necessary, such tax claim to the
treasurer or tax collector in the county in which said
property may be found, and such taxes shall be collected
at the latter place, as other taxes on personalty in the man-
ner provided by law; and the tax collector to whom such
claim is forwarded shall make return to the proper county,
less such charges for collection as are provided by law;
and such treasurer or tax collector is hereby authorized to
enforce the collection of said claim in the manner pro-
vided by law for the collection of delinquent taxes."
Laws 1888, Ch. 69, Sec. 1, p. 143.

Neither Section 3847, nor the law of 1888, affects the
question in the case at bar.   The property in the detached
territory has not been removed by the act of the owner,
nor anyone in his interest.   It is presumably located just

where it was when the assessment was made. The county jurisdiction is changed by the operation of the statute and proceedings thereunder resulting in the organization of a new county. This much may be said, that while section 3847 seems to recognize the authority of the collector to take possession of property in another county, the act of 1888 proceeds upon a different theory, although the latter provision may have been made in the interests of economy.

Now, it is evident that no official of Big Horn County can legally collect the taxes due either of the parent counties from the property or persons now in the former county solely by virtue of its organization. No official of that county has, or can rightfully obtain, a warrant for such collection. No such official represents in any capacity the old county to whom the taxes belong and are payable. The right of collection resides in the old county, and its officers, if it exists at all. It may be acknowledged that, as a general rule, county officers have no authority to act outside their county; and that a tax collector can not proceed for the collection of taxes against lands or personalty lying beyond his territorial jurisdiction.

A contrary rule has been held to prevail where the property already subject to a tax lien has been transferred to another county by a division of the county; and, although the decisions are not altogether harmonious, a review of them will show that by the great weight of authority, this doctrine is sustained.

In Black on Tax Titles it is said, "But the lien on land of a tax assessment continues after the land has been transferred to another county, and the tax collector from the original county can enforce the collection of the tax by a sale." Sec. 117. And Blackwell, in his work on Tax Titles, states the rule thus: "Where, after an assessment is made, the county in which the proceeding was had is divided, the collector of the old county has power to sell land lying in the territory embraced in the newly created county. This is in conformity with the general principles of law in analogous cases." p. 295.

· The analogous cases referred to by Blackwell are mostly those involving judgment liens.   It is settled law that where a judgment lien attaches upon lands in a certain county, and afterward a new county is set off, within which these lands fall, the lien does not cease to exist by reason of such new organization, but holds during the full period allowed by statute without any further record. 1 Black on Judgments, Sec. 417; Davidson v. Root, 11 O., 98; West's Appeal, 5 Watts, 87.   The leading case on this subject, with reference to taxes, is Devor v. McClintock, 9 Watts & Sergeant, 80, and is the only case cited by Blackwell.   That case involved the title to certain lands which were originally in that part of Cumberland County, afterward erected into a new county called Perry.   Taxes were assessed against the lands by Cumberland County prior to the year 1820, when Perry County was created. In 1824, they were sold for non-payment by the treasurer of the old county and bid in by that county.   After the organization of Perry County, it assessed the same lands, and they were subsequently sold by the treasurer of Perry County.   The parties claimed respectively under purchases from Cumberland and Perry Counties.   The contention by the grantee of Cumberland County was that while the land belonged to that county it was not subject to taxation by Perry County.   This proposition the court denied, but with reference to the sale by the treasurer of the old county, the court said, " We have determined that a county may sell for taxes after the land has passed from its jurisdiction."   When such a determination was made is not stated; but we find that in an earlier case, in the same State, viz., Barnett Township v. Jefferson County, the court held that road taxes on lands assessed and payable by the county to a township before division of it, should be paid to the same township after its division, although the lands lay in the new township and the taxes were collected after its erection.   9 Watts, 166.

In California it was held, following the text in Blackwell, that where land was in one county at the date of the

assessment, a subsequent change in the county boundaries resulting in a transfer of the land to another county, could not defeat the lien of the assessment nor divest the collector of the parent county of the power to enforce the collection of the taxes by a sale of the land. Moss v. Shear, 25 Cal., 38, 47. The same doctrine was announced in King Co. v. Johnson, 104 Cal., 198.

Judge Cooley in his work on taxation adopts the views of the Pennsylvania and California courts, and says, following a statement already quoted in this opinion: "The duty of collecting the tax will also be upon the officers of the old municipality." Cooley on Taxation, 239.

In Colorado the tax collector of a school district was empowered by statute to collect taxes by distress and sale of goods and chattels *found within the district;* and it was held that he had no authority to levy upon goods found outside his district, although the place where the goods levied upon were taken was within the district when the tax was levied. But the court said: "The rule may be otherwise as to a tax against real estate which is a lien upon the property from the date of the levy." Citing Moss v. Shear, supra. In Colorado there was no lien upon personalty until seizure. Mc Kay v. Batchellor, 2 Colo., 591. That case is easily distinguished from the one here; first, because our statute does not *expressly* confine the power of distress to the district wherein the tax was levied; and second, our statutes do constitute the tax upon personal property a lien thereon. In the case of Harmon v. New Marlborough, 9 Cush., 525, it appears that the assessors of New Marlborough assessed the plaintiff for a tax voted in April, at a meeting which was attended by inhabitants of the territory afterward on May 24th, set off to Monterey. Taxes were assessable according to residence on May 1st. The court said: "His legal obligation was fixed on that day" (May 1st). "The transfer of part of New Marlborough to Monterey by statute, afterward on the 24th of that month, no more affected his existing legal liability to New Marlborough,

than his voluntary removal individually from the town of New Marlborough would have done." In Waldron v. Lee, 5 Pick., 323, the court by Mr. Chief Justice Parker said: "When a tax is legally voted to be raised for purposes authorized by law, there is an inchoate right in the inhabitants of the body within which it is raised. The assessment is only the apportionment of the whole sum upon the individuals liable, according to the rules established by law; and when that assessment is made each individual becomes indebted for the part or portion which is assigned to him. He can not be discharged of this debt but by payment or by abatement, according to the provisions of law. Wherever he goes the debt will follow him, and by the statute he may be pursued by the collector with his warrant of distress into any other part of the commonwealth." "If by act of the town he and his estate shall, after the assessment of the tax, be made to belong to another district by an alteration of the limits, or the creation of a new district, he will still be indebted for the tax assessed before the division or alteration."

In Rhode Island a case arose involving the collection of a tax voted and assessed by a fire district. The tax was voted on April 1 to be assessed in August. In May the territorial limits of the district were extended so as to include the complainants seeking an avoidance of the tax. At a subsequent meeting of the district the tax was ordered to be assessed in November instead of August. It was assessed in November. Before its collection the statute enlarging the boundaries was repealed, thus excluding complainants thereafter from the district. Among other objections to the tax it was urged that the repeal of the statute enlarging the district avoided the tax. It was held otherwise. The court said: "If, therefore, the tax, when assessed in November, was rightly assessed while the complainants were within the corporation, the repeal of the act which placed them there could not discharge the liability which accrued while there, and while the act was in force." Sherman v. Benford, 10 R. I., 559.

In Indiana the statute provided upon the division of a

county that "All taxes that shall be levied and assessed at the time such change shall be made, shall be collected in the same manner as if no change had been made in the boundaries of said counties." It was held that the taxes assessed by an old county were properly collected by said county from the taxpayers in the detached territory. Board, etc., of Morgan Co. v. Board, etc., of Hendricks Co., 32 Ind., 234. In Kansas, a township had issued bonds, and before their payment a portion of the territory of the township had been detached and with other territory organized into a new township. The detached territory was still liable for the payment of the bonds. The statute regulating the levy of taxes to provide for such payment provided that the proper officers of the township should annually levy a sufficient tax to pay the interest on the bonds and to create a sinking fund for their ultimate redemption. It was held the duty of the officers of the old township to levy the tax not only upon all the taxable property remaining in their township, but upon all the real estate of the detached territory. The taxable real estate only of territory detached from a township was made by statute subject to taxation for the payment of bonds, in the same manner as though no change of boundary lines had been made. Fender v. Neosha Falls Tp., 22 Kan., 305.

An interesting and instructive case arose in Alabama. In that State taxes are not assessed during the year in which they accrued, but early in the following year. Taxes for 1892 were assessed by the town of New Decatur in July, 1893, as required by law. Such taxes were assessed upon property located in territory which during the entire year of 1892 was a part of the town, but by an act of the Legislature passed in February, 1893, had been separated therefrom. Therefore, at the time of the assessment and levy, the property was not located within the corporate limits. The town was proceeding to sell certain lands located in such detached territory for the taxes so assessed, and the sale was sought to be enjoined. There

does not appear to have been any express statutory pro-
visions covering that particular case.   The court, in up-
holding the tax and the right of the town to collect the
same, said: " As we understand this record, the taxes
claimed are not based on alleged ownership of the lots in
the corporate limits of the town throughout 1893.   Such
claim could not be asserted until the end of that year.
The claim is predicated of Mr. Nelson's ownership in
1892, and up to February 8, 1893.   Taxes with us are
assessed early in the year, and should, at least, embrace all
property and subjects of taxation owned and enjoyed
during the preceding year, and on January 1 of the year
of the assessment.   They can not be assessed as of the
current year, for they can not, as a rule, be known.   It
is just being entered upon."

" It is not denied that Mr. Nelson owned the property
in 1892, and that during that entire year, and until Febru-
ary 8, 1893, the lots were within the corporate limits of
New Decatur.   For this and this only were they sought
to be taxed.   They enjoyed municipal protection during
the entire year 1892, and until the change of boundary.
Having enjoyed municipal protection, shall not the prop-
erty be assessed for the support of that municipality?"

The court found that the bill was without equity, and
added: "We are at a loss to perceive how it can be
amended so as to give it equity."   New Decatur v. Nelson,
102 Ala., 556.

In that case, it will be noticed, not only was the collect-
ing officer held authorized to collect, but the corporate
authorities were declared empowered to make the levy
upon property which at the time thereof was without the
corporate boundaries.

The doctrine laid down as above by the text writers and
the decisions referred to is flatly disputed in one case only
that we have been able to discover.   In Deason v. Dixon,
54 Miss., 585, the authority of a city tax collector to sell
lands which had been regularly assessed for city taxes,
and afterward detached from the corporate limits was

denied.   The case of Devor v. Mc Clintock, supra, was cited, but with disapproval.   It was held that the authority of a local tax collector was limited to the territory of his district.   The court said: "The excision of territory from the district of a tax collector must terminate his power to sell it, unless otherwise provided by law."   It was, however, declared that the owner of the land was not released from the tax, but that his property remaining in the corporate limits was bound, and might be sold for the entire tax.

In Nebraska, where an unorganized county was attached to an organized county for election, judicial, and revenue purposes, and was organized subsequent to the levy of taxes by the county to which it was previously attached, it was held, upon a construction of their statutes, that the newly organized county became the owner of and entitled to the taxes so levied, and that they were collectible by its officers.   Morse v. Hitchcock, 19 Neb., 566.

A few of the cases, notably those from Massachusetts and Indiana, find the authority for the tax collector in the statute, but in the others it is made dependent upon the existence of a tax lien.

We think it well settled that the tax lien is not defeated by a contraction of the county boundaries.   The statute creates the lien, and has also furnished a remedy for its enforcement.   That remedy is a summary one.   The whole power of enforcement resides in the county tax collector who is, in the exercise of that power, fortified and justified by the tax list and warrant aided by the statute.   They entitle him to take and sell the personal property, and to advertise, sell, and convey lands upon which taxes have been laid and have become delinquent. As the lien continues, and neither the statute nor warrant expressly confines the enforcement thereof by the collector within the limited jurisdiction of his county, we perceive no reason why he may not pursue such personal property into the detached territory, and sell the lands located therein for the non-payment of the taxes lawfully assessed

and levied thereon. When he received the list and warrant, and when the taxes became delinquent, the property was within the actual limits of his county. Such property was then affected by, and subject to, the authority of the warrant and the powers of the collector. It has not been removed beyond the jurisdiction by the owner or any other person. It remains in the same territory, but the latter has by force of the statute become a part of another county. Such fact, in the absence of legislative expression or intent, ought not to relieve the property, either personal or real, from the lien of the tax, or the jurisdiction of the officer.

By the great weight of authority, as we have shown, it is not relieved. The lien not only remains, but the authority of the tax officer for its enforcement likewise continues. The sale of the lands for taxes is probably required to be held at the courthouse of the parent county.

We doubt the power of the collector to distrain property beyond the limits of his county not previously subject to a tax lien; but we think that he possesses the same authority as before the division of the county, to collect the taxes in the detached territory from the property assessed, or upon which a lien for any of the taxes has attached.

Had it been possible we would have avoided a decision of this question, as none of the persons subject to the taxes are individually before the court, but it is one which fairly arises in these proceedings. The court is bound to determine whether or not they are credits of the parent county.

We have, in this discussion, of course, regarded the delinquent taxes as in all other respects valid and enforceable.

The collection of the taxes can not be enforced by the new county. Otherwise both the fourth and fifth questions, for the reasons aforesaid, must receive an affirmative answer, considering the taxes as assets, not as debts.

As questions rather than cases are authorized to be certified or reserved for the decision of this court, we have been reluctant, and have heretofore refused, to direct the particular judgment to be entered, preferring to decide nothing but the legal propositions involved.   We observe no reason for departing from those precedents, and therefore do not esteem it necessary to definitely determine whether the motion to strike the answer from the files should be sustained or denied.   It is possible that there may be statements or allegations in the answer, which are not involved in any of the legal propositions submitted for our decision independently of the general question respecting the disposition to be made of the motion to strike.

Our views upon the matters embraced in the first, second, third, and tenth questions respectively, have been fully expressed herein, and what has been said, we believe, sufficiently answers those questions without further specific statement.

CORN, J., and KNIGHT, J., concur.